MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

SUSAN E. BADGER  (CABN 124365)
HARTLEY M.K. WEST (CABN 191609)
Assistant United States Attorneys

    450 Golden Gate Ave., Box 36055
San Francisco, California 94102
Telephone:  (415) 436-7200
Fax: (415) 436-7234
E-Mail: Susan.Badger@usdoj.gov
           Hartley.West@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | ) | No.  CR 11-0497 CW |
|---|---|---|
| Plaintiff, | ) | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | ) | Date:    June 19, 2012 |
| DANNY HARRIS, JR., | ) | Time:   2:30 p.m. |
| Defendant. | ) | Court:  Honorable Claudia A. Wilken |

GOVT'S SENT. MEMO [HARRIS]
CR 11-0497 CW

1

2

## TABLE OF CONTENTS

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

  A.  The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    1.  The Firearms Offenses.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    2.  The Obstruction Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

  B.  The Guidelines Calculations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  C.  The Government's Sentencing Recommendation. . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

## FEDERAL STATUTES, RULES, AND GUIDELINES

18 U.S.C. § 1512(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 9

18 U.S.C. § 1512(f)(1). . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

18 U.S.C. § 3553(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

18 U.S.C. § 3553(a)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

18 U.S.C. § 922(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G § 3C1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

U.S.S.G § 3D1.2(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

U.S.S.G. § 2J1.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

U.S.S.G. § 2K2.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

U.S.S.G. § 2X1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

On March 9, 2012, defendant Danny Harris, Jr. entered guilty pleas to two counts of making a material false statement in connection with the acquisition of a firearm, in violation of 18 U.S.C. § 922(a)(6), and as alleged in Counts One and Three of the indictment. Harris also pled guilty to conspiracy to impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and as alleged in Count Six of the indictment. Three days earlier, on March 6, 2012, Harris's co-defendant, Raymond Thomas, Jr., also entered a guilty plea to Count Six of the indictment.

Sentencing of both defendants is scheduled to take place before this Court on June 19, 2012 at 2:30 p.m. The government submits this Sentencing Memorandum in order to discuss Harris's offense conduct, advise the Court of its calculation of the applicable sentencing guidelines, and advise the Court of its sentencing recommendation.

## DISCUSSION

### A. The Offense Conduct

#### 1. The Firearms Offenses

The crimes to which Harris pled guilty, as well as the relevant conduct, took place between approximately June 2009 and December 2010. During that time, Harris was employed as a police officer with the Richmond Police Department (hereinafter "RPD"), where he worked since February 2001. One of the activities in which Harris engaged was helping to run the Police Department's Explorer Program. Young men and women between the ages of 14 and 20 participate in the Explorer Program as a way of engaging in community service and in order to assess whether they might want to pursue a career in law enforcement.

In approximately June 2008, Harris and co-defendant Raymond Thomas, Jr., who was also a police officer with RPD, incorporated and obtained a state license for Strategic Reliance Security Group (hereinafter "SRSG"), a private patrol business. According to witnesses whom the government has interviewed, Harris ran the business. Harris obtained contracts with public housing and other entities to provide armed private security guard services. According to Lt. Manjit Sappal at RPD, the Department has a

policy that requires anyone who has an outside employment interest to submit a request for approval to work secondary employment. This would include operating a private security guard business. Lt. Sappal has advised that in 2009 there was an Internal Affairs investigation into Harris's and Thomas's ownership of the private security guard company, and they were told to cease and desist due to a conflict of interest.

Evidence developed over the course of the instant investigation established that Harris, at least, continued to operate SRSG and employed a number of people as armed private security guards who were licensed through the State of California. The fact that Harris was continuing to operate the company came to light in early September 2010, when one of the SRSG employees, Sergio Rios, told RPD Captain Alec Griffin, a patron at Rios's father's dry cleaning business, about some issues that SRSG employees were having regarding not getting paid in a timely fashion. In the course of the conversation, Captain Griffin learned that Harris was operating SRSG and had recruited some former RPD Explorers to work for him. Captain Griffin reported this information to RPD, which then initiated two investigations. One was an internal affairs investigation into the fact that Harris was apparently running a security guard business without RPD knowledge or authorization. The other was a criminal investigation into how underage SRSG employees had come to possess firearms to use in the course of their employment.

Immediately thereafter, RPD Lt. Michael Gormley conducted interviews of Sergio Rios and Orlando Torres, another SRSG employee. Rios and Torres are good friends who were Explorers with RPD while in high school. In their separate interviews, Rios and Torres explained that Harris had recruited them to work for SRSG in the summer of 2009. Their primary contact was with Harris; Rios recalled that Harris wanted the fact that he was running a security company on the side to be kept confidential.

Rios turned three guns over to Lt. Gormley: a Glock model 17 semiautomatic pistol; a Glock model 22 semiautomatic pistol; and a Sig Sauer pistol. Rios explained that the Sig Sauer was the "loaner" gun owned by SRSG; it was used by SRSG employees when performing their security guard duties. The Glock 22 was Torres's gun; he gave it

to Rios to turn over to Lt. Gormley. Rios advised that the Glock 17 was his gun. When Lt. Gormley asked how Rios came to purchase the Glock 17 pistol, Rios explained that it was difficult to work all the hours required of him at SRSG when there was only one company gun available. He discussed the issue with Harris, who told Rios that if Rios came up with the money to purchase a gun, Harris could get a law enforcement discount at LC Action Police Supply in San Jose. Apart from the issue of cost, there was a significant legal impediment to Rios simply going out and buying his own gun. At the time, Rios was only 19 years old. Under federal law, a federally licensed firearms dealer such as LC Action was prohibited from selling a handgun such as a Glock pistol to someone under 21 years of age. Harris solved this problem by taking Rios's money, buying the gun for him, and then turning the gun over to Rios so that he could use it while on duty. In the course of doing so, Harris violated the law by acting as a straw buyer and falsely stating on a federal firearms form that he was the true buyer of the gun.

When Lt. Gormley interviewed SRSG Orlando Torres, Torres related similar events regarding his acquisition of the Glock 22 pistol. Torres told Harris that he could not take all the SRSG work assignments being offered to him because the Sig Sauer was not always available for use when he was on duty. At the time, Torres was 20 years old. Harris told Torres that if Torres came up with the money, Harris would purchase the gun for him. Once Torres was 21 years old, Harris would transfer the registration into Torres's name.

It is worth noting at this point that while it was illegal for anyone under 21 to purchase a handgun from a federally licensed firearms dealer, Rios and Torres were not prohibited under federal or California law from possessing and using a handgun in the course of their duties as state-licensed private security guards. Each had obtained the appropriate license to be a private security guard and to carry a firearm in the course of performing those duties.

On June 19, 2009, Harris, Rios, Torres and two friends of Rios and Torres drove to LC Action in San Jose together. LC Action Police Supply is a federally licensed firearms

dealer that sells exclusively to law enforcement and other emergency services personnel, and offers discount prices to its customers.  After arriving in San Jose, but while still sitting in the car, Harris asked Rios and Torres for their money so that he could purchase the guns.  They each handed him approximately $500 in cash.

All five men then went into LC Action.  While the others browsed in the store, Harris spoke to the clerk and made arrangements to purchase the Glock 17 and Glock 22 pistols.  Harris paid cash for both firearms that day.  Because the Glock 17 that Rios wanted was not in stock and had to be ordered, Harris did not fill out any paperwork for that gun on June 19.  However, he did fill out paperwork for Torres's Glock 22 that day.

Federal law requires that in connection with the sale of any firearm by a federally licensed firearms dealer such as LC Action, the buyer must fill out a U.S. Department of Justice / Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473 entitled "Firearms Transaction Records Part 1 – Over the Counter."  The form must be filled out personally by the "Transferee (Buyer)."  The form includes the following explicit warning in bold: **"Warning: You are not the actual buyer if you are acquiring the firearm on behalf of another person.  If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you."**  The form also provides a hypothetical scenario by way of explanation, stating that if Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith, and if Mr. Smith gives Mr. Jones the money for the firearm, then Mr. Jones is not the actual transferee / buyer.

With those warnings and explanations, Question 11.a. of Form 4473 asks the individual making the purchase: "Are you the actual transferee / buyer of the firearm(s) on this form?"  Immediately after this question, the form asks a series of questions designed to establish whether the buyer is someone who is prohibited by law from possessing a firearm, e.g. the form asks whether the buyer has ever been convicted of a felony, has been adjudicated mentally defective, is an alien illegally in the United States, etc.

In connection with the purchase of the Glock 22 for Torres on June 19, 2009, Harris answered Question 11.a. by checking "yes."  He also signed the form immediately beneath

1  a statement certifying that his answers were "true, correct, and complete."  The same

2  certification required the signer to acknowledge as follows: "I understand that answering

3  'yes' to question 11.a. if I am not the actual buyer is a crime punishable as a felony under

4  Federal law, and may also violate State and/or local law."  Harris's false statement that he

5  was the true buyer of the gun for Rios forms the basis for Count One of the indictment, to

6  which Harris has pled guilty.

7      In order to obtain a waiver of California's ten-day waiting period, Harris provided

8  LC Action with what is known as a "Chief's Letter."  Such letters, which state that the

9  purchaser is a police officer and he or she has no convictions for any domestic violence

10  offenses, are routinely prepared by police departments and accepted by LC Action.  As

11  long as the letter is an original, is on Police Department letterhead, and is signed by the

12  Chief of Police, LC Action is authorized by the state of California to waive the 10-day

13  waiting period and deliver the gun to the purchaser.[1]  Because the letter Harris provided

14  was not an original, LC Action did not waive the waiting period.  Records show that

15  Harris picked up the gun on July 7, 2009 and at the time, re-certified on the Form 4473

16  that his previous answers were correct.  Rios and Torres were with Harris that day.  After

17  they left the gun shop, Harris turned the Glock 22 over to Torres and Torres continued to

18  possess the gun and use it while performing his security guard duties until he surrendered

19  it to RPD.

20      The same scenario played out in connection with Harris's purchase of the Glock 17

21  for Rios.  Once the gun was in stock at LC Action, Harris returned to the store,

22  accompanied by Rios and Torres, on November 9, 2009.  At that time, Harris filled out the

23  Form 4473, falsely answering that he was the true buyer of the gun.  This false answer

24  forms the basis of Count Three of the indictment, to which Harris has also pled guilty.

25  Harris presented LC Action with an original of a Chief's Letter stating that "[t]his weapon

26

27      [1] Secretarial staff at RPD advised that they routinely prepare Chief's letters at the
requests of officers who are seeking to purchase firearms for use in the regular course of their
28  duties.  They use a standard format, stamp the Chief's signature on the letter, provide the original
to the requesting officer, and maintain a copy of each such letter in the officer's file.

GOVT'S SENT. MEMO [HARRIS]
CR 11-0497 CW                         5

1   will be used in Officer Harris's official duties as a police officer." Based on that letter, LC

2   Action waived the 10-day waiting period and delivered the gun to Harris. Rios and Torres

3   then drove to a nearby gas station, where they met Harris. Harris turned the Glock 17 over

4   to Rios, who then maintained the gun in his possession, and used it in his duties as a

5   private security guard, until he turned it over to Lt. Gormley.

6          Rios and Torres reported that Harris had always told them that once they turned 21

7   years of age, he would transfer the guns into their names. Harris said that he was

8   concerned about Rios or Torres getting involved in a shooting while on duty, and Harris's

9   name coming up as the registered owner. Because of those concerns, and while Rios was

10  still underage, Harris asked Rios if the gun could be transferred into Rios's father's name.

11  Harris assured Rios that such a transaction would be entirely legal. Based on these

12  assurances, Rios's father agreed to the transfer. In February 2010, Rios, Rios's father, and

13  Harris went to a firearms dealer in Marin County, where Rios's father filled out paperwork

14  for the acquisition of the gun. From this point on, the gun was registered in the father's

15  name, and Rios continued to possess and use it. By this date, Torres had turned 21 and he

16  went along on this trip with the intention of Harris transferring the Glock 22 into Torres's

17  name. However, Torres did not have acceptable ID in his possession, and the transfer of

18  registration did not take place.

19         Count Four of the indictment relates to a third firearm purchase by Harris in which

20  he lied on the Form 4473 about being the true buyer of the gun. In this case, Harris

21  offered to do a favor for former Explorer Manuel Madrigal. Madrigal was over 21 and

22  could legally purchase a firearm from a dealer. In late 2009 / early 2010, he ran into

23  Harris and told Harris that he was attending a police academy and needed to purchase a

24  gun. Harris offered to purchase a gun for Madrigal at LC Action in order to take

25  advantage of LC Action's discount for police officers. Madrigal ended up paying for a

26  Glock 22 that Harris purchased from LC Action in February 2010. Again, Harris lied on

27  the Form 4473 about being the true buyer of the gun. Harris also provided a letter on RPD

28  Chief of Police letterhead stating that the weapon would be used in Harris's official duties

1    as a police officer.  Relying on that letter, LC Action waived the 10-day waiting period for

2    the gun.  Madrigal possessed the firearm until he heard about the RPD investigation of

3    Harris.  Knowing that the gun was registered in Harris's name and fearing that Harris

4    would accuse Madrigal of stealing the gun, Madrigal came forward, contacted RPD, and

5    turned over the gun as evidence to Lt. Gormley.

6                 ***2. The Obstruction Offense***

7            As noted above, the RPD investigation of Harris and Thomas started in mid-

8    September 2010.  The criminal side of things, which had to do with the gun purchases,

9    focused on Harris.  The internal affairs side of things, focused on Harris and Thomas

10   owning SRSG.  By this time, there had been a falling out between Harris and some of the

11   SRSG employees, including Rios and Torres, over issues such as pay and hours.  In fact,

12   some employees had gone to the state Labor Board to inquire about their rights and

13   making a complaint.

14           As the fact of the internal affairs investigation became known to Harris and

15   Thomas, they embarked on a course of action designed to intimidate and harass Rios and

16   Torres; get hold of the Torres Glock 22, which was still registered to Harris and

17   constituted evidence of Harris's straw buyer purchase; and damage the credibility of Rios

18   and Torres as any investigation or proceedings moved forward.  As Harris and Thomas

19   took steps to accomplish these goals, RPD continued to investigate both the internal affairs

20   issues and possible criminal conduct on Harris's part.  At the end of October 2010, the

21   RPD Chief of Police referred the criminal gun matter to federal authorities and the FBI

22   initiated an investigation of possible violations of federal laws in connection with Harris's

23   false statements on the Rios, Torres, and Madrigal firearms forms.

24           The course of action described above took place from September through early

25   December 2010, and forms the basis of Counts Five and Six of the indictment.  Count Five

26   charges Harris and Thomas with conspiring to prevent Rios or Torres from communicating

27   information about a possible federal crime to a federal law enforcement officer.  In light of

28   the fact that Harris and Thomas were both law enforcement officers and could be assumed

GOVT'S SENT. MEMO [HARRIS]

to be familiar with the law, there was a reasonable likelihood that had either Torres or Rios spoken to a law enforcement officer about Harris's straw purchase of one or more of the guns from a firearms dealer (all of whom are federally licensed), at least one of those communications would have been to a federal law enforcement officer. Count Six – to which both Harris and Thomas have pled guilty – charges the defendants with conspiring to impede an official investigation, that is, a proceeding before a federal grand jury or a judge or Court of the United States. Again, given that Harris and Thomas were police officers, a federal investigation and possible federal prosecution of Harris for violating federal gun laws was reasonably foreseeable to Harris and Thomas. The law provides that it is not necessary for an official proceeding to be pending or about to be instituted at the time of the offense. 18 U.S.C. § 1512(f)(1). Harris's and Thomas's efforts to retrieve the Glock 22 from Torres and damage Rios's and Torres's credibility as witnesses were intended to impede any investigation or prosecution that might develop, including a federal investigation or prosecution.

On September 17, 2010, Lt. Sappal met with Harris and informed him that he was being placed on administrative leave due to the outside employment. Lt. Sappal informed Harris that he was to have no contact with current or former Explorers. At that time, Thomas was out on leave for an injury. A week later, Torres reported to Lt. Sappal that he had received repeated calls and text messages from Thomas demanding that Torres turn his Glock over to Thomas. Shortly thereafter, the imperative tone and manner of the demands escalated. On or about September 26, 2010, Thomas sent a letter to Torres stating that he, Thomas, had purchased the gun from Harris, and demanded that Torres deliver the gun. In the letter, Thomas mentioned "power of attorney." Torres did not understand what this meant and was intimidated by the tone.

These contacts by Thomas prompted Lt. Sappal to e-mail a letter to Thomas on September 27, 2010, informing Thomas that he was to have no contact with any current or former Explorer.

///

1   Thomas telephoned Lt. Sappal and asked if this meant he could not pursue a civil action

2   against Torres.  Lt. Sappal told Thomas that the prohibition on contact did not preclude

3   filing a civil action.

4        On September 28, 2010, Thomas took the next step in trying to get the gun from

5   Torres and filed a suit in Contra Costa County Small Claims Court asserting that he had

6   purchased the gun from Harris.  The filing of this suit and Thomas's September 26, 2010

7   form the basis for both Harris's and Thomas's guilty plea to Count Six of the indictment.

8   They both admitted that their goal in Thomas undertaking these efforts was to obtain

9   possession of the Glock 22 pistol, which could be used against Harris in a federal

10  investigation and, possibly, prosecution.  Following his filing of the lawsuit, Thomas had

11  two different attorneys write to Torres demanding delivery of the gun.

12       The first hearing in the Small Claims Court case took place on November 3, 2010

13  and was attended by Thomas.  Lts. Sappal and Gormley also attended, as did Torres.

14  Audio recordings of the proceedings show that the judge was having some difficulty

15  understanding what the suit was about.  At a couple of points during the hearing, Lt.

16  Sappal stated that the gun that was the subject of the suit was in RPD custody.  Presumably

17  Thomas heard these statements and understood that the Glock 22 was no longer in

18  Torres's possession.

19       The next day, Thomas and Harris changed tactics and retained the services of

20  private investigator Chris Butler (who has pled guilty to different charges in a separate

21  federal criminal prosecution, *United States v. Christopher Butler*, CR 11-0529 SBA), to

22  target Rios and Torres.  The initial target of this effort was Rios, and the idea was to use a

23  young and attractive female Butler employee to lure Rios into a compromising position.

24  Specifically, the plan was to get the two acquainted, have the female employee flirt with

25  and establish an interest in Rios, and ultimately set up a scenario where Rios was pulled

26  over for driving under the influence and his gun was discovered in his car.  Although the

27  ultimate use of this result was not explicitly discussed with Butler, a reasonable

28  assumption is that to the extent that Rios was in trouble with the law, his credibility and

usefulness as a witness against Harris and Thomas would be diminished.  According to Butler and at least one other Butler employee with whom these scenarios were discussed, Harris and Thomas approved of this plan.  Butler and the employee did not know what it was that Harris and Thomas had against Rios and Thomas; they recall the officers saying that Rios and Torres were no good and had gotten them into trouble.  Thomas used his credit card to pay the initial retainer and subsequent charges for Butler's services.

It was no coincidence that Harris and Thomas ended up going to Butler when they wanted to target someone whom they wanted to get in trouble.  Only two months earlier, they had retained Butler's services to "dirty up" a fellow RPD officer.  Again using Thomas's credit card, they paid Butler to have an attractive female Butler employee introduce herself to and flirt with the RPD officer; text him and express an interest in further meetings; and ultimately meet with him with the goal of luring him into a compromising position.  The operation was successful, and according to Butler employees who were present when the audio and videotapes of the RPD officer kissing the young woman in a public parking lot were played for Harris and Thomas, the clients were extremely pleased with the results.

Butler and his associates undertook the new assignment with the goal of getting Rios in a compromising position, and accomplished a number of steps toward that objective.  A young female Butler employee targeted Rios and met him at his job as a security guard at a movie theater.  From there, they engaged in flirtatious text messages and met once for a casual date.  Text messages in late November and early December 2010 show that the young woman was arranging for Rios to meet with her and another girl and encouraging Rios to bring his gun.  Before the planned date in early December took place, a Butler employee who felt badly about the set-up that was about to take place sent an anonymous message to Rios via Rios's Facebook page and warned him against going on the date.  Rios heeded the warning and had no more contact with the young woman.  From that point on, Harris and Thomas took no further steps in the efforts to put Rios or Torres in compromising positions or to get either of the guns back.

**B.  The Guidelines Calculations**

The parties and the U.S. Probation Officer concur in the calculation of the sentencing guidelines as to Harris.  Pursuant to U.S.S.G. § 2K2.1, the offense level for the false statements on the Rios and Torres gun forms starts at level 12, and two levels are added because the offense involved three guns, including the relevant conduct of the Madrigal gun.  Two additional points are added pursuant to U.S.S.G. § 3C1.1 because Harris attempted to obstruct or impede the investigation of the gun offenses.  That brings the adjusted base offense level for the gun counts to 16.

Pursuant to U.S.S.G. §§ 2X1.1, and 2J1.2, the adjusted base offense level for Count Six, conspiracy to impede an official investigation, is 11.

The gun and obstruction of justice counts are grouped pursuant to U.S.S.G. § 3D1.2(c) and Application Note 5 because Count Six embodies conduct that is treated "as a special offense characteristic in, or other adjustment to, the guideline applicable to" Counts One and Three.

As a result, the adjusted base offense level for the group is the higher of the two levels, or level 16.  The government concurs with the Probation Officer's determination that Harris has met the criteria for the three-level downward adjustment for acceptance of responsibility.  Accordingly, the final adjusted base offense level is 13.  With Criminal History Category I, Harris's guideline range is 12 to 18 months.

**C.  The Government's Sentencing Recommendation**

Pursuant to the provisions of 18 U.S.C. § 3553(a), which require the Court to take into account a number of factors, including the sentencing guidelines, in determining the sentence, the government recommends that the Court impose a sentence of 12 months imprisonment.  This is a sentence that is sufficient, but not more than necessary, to comply with the purposes of sentencing, as set out in § 3553(a).  Harris's guilty pleas, admissions of guilt, and acceptance of responsibility for his illegal conduct are mitigating factors that weigh in favor of a sentence at the low end of the applicable guideline range.  However, greater leniency in the form of the split sentence proposed by the Probation Officer goes

1   too far under the circumstances of this case, which include several aggravating

2   circumstances.  Chief among those are the facts that it was not a one-time event or lapse in

3   judgment that led to the instant prosecution, and over the entire course of the conduct

4   described above, Harris was a law enforcement officer sworn to uphold and obey the law.

5        Two of the factors that the Court is required to consider in determining the sentence

6   are the nature and circumstances of the offense and the history and characteristics of the

7   defendant.  18 U.S.C. § 3553(a)(1).  The government has received and reviewed the

8   written statements from Harris's family members, colleagues, and friends, and members of

9   the community.  Those statements speak of Harris's accomplishments, the contributions he

10  has made to the community, and the care and support he has provided, and continues to

11  provide, to family members.  Arguably, Harris's most significant accomplishment is his

12  achievement in school and subsequent 10-year employment with RPD as a police officer.

13  All of this suggests an individual who would be committed to enforcing the law and not

14  breaking it.

15       The other side of the coin is the manner in which Harris conducted himself during

16  the eighteen months ending in December 2010.  The nature and circumstances of the

17  offenses and the characteristics that Harris demonstrated in connection with committing

18  those offenses paint an entirely different picture.  In connection with three separate gun

19  purchase transactions, Harris made material false statements on four separate occasions

20  between June 19, 2009 and February 16, 2010.  While working as a police officer and

21  sworn to uphold the law, Harris baldly lied on firearms transaction forms that are required

22  by law enforcement.  Further, he obtained from RPD, and presented to LC Action Supply,

23  letters on the letterhead of the RPD Chief of Police falsely stating that the three handguns

24  he was purchasing would be used by him in the course of his official duties.  Not only did

25  Harris commit crimes in connection with these acts, he flagrantly breached his sworn and

26  ethical duty to uphold the law.

27       In pleading guilty and cooperating with the Probation Officer preparing the

28  Presentence Report, Harris has admitted to making the false statements on the firearms

1  forms in order to purchase the Rios and Torres guns, and expressed regret for the harm

2  that his bad choices have caused.  However, Harris has not yet provided any explanation as

3  to why he made these bad choices and what compelled him to break the law.  The evidence

4  indicates a cavalier attitude toward the law when it presents inconvenient obstacles.  That

5  is, in order to fulfill contracts for security guard services, Harris needed  his employees to

6  be armed.  Apparently unwilling to spend the money for firearms for employees to use,

7  Harris made it possible for the employees to purchase their own guns.  This was a

8  financially expedient way to make sure that he had enough armed employees to fulfill

9  SRSG's contractual needs and to avoid spending money on company firearms.  It appears

10  that Harris was not prepared to have the federal statute prohibiting the sale of handguns to

11  minors pose an impediment and was prepared, for selfish financial reasons, to lie on the

12  firearms forms required by federal law enforcement.  Adding to this cavalier attitude is the

13  fact that Harris lied to his employer in order to obtain the Chief's letters and thereby

14  circumvent the 10-day waiting period for the guns.

15      All of this conduct raises serious questions about Harris's character for honesty and

16  integrity.  These concerns become even more grievous when one looks at what transpired

17  after Harris became aware of the RPD Internal Affairs investigation of SRSG and was

18  admonished not to have contact with any current of former Explorers (such as Rios and

19  Torres).  The government is not aware of when, or the circumstances under which, Harris

20  came to involve his co-defendant, Raymond Thomas, Jr., in issues having to do with the

21  guns he purchased for Rios and Torres.  The Presentence investigation thus far has not

22  provided any illumination on the subject.  What the evidence shows is that starting in the

23  same time frame that RPD was initiating its investigation and interviewing Rios and

24  Torres, Thomas initiated a number of contacts with Torres with the mission of getting hold

25  of the Glock 22 that was still registered in Harris's name.  Apparently unaware that Torres

26  had turned the gun over to RPD in mid-September 2010, Thomas employed means that

27  escalated in terms of intimidation to compel Torres to give him the gun.  These means

28  included text messages, letters from Thomas and attorneys on behalf of Thomas, and then

1    a suit that Thomas filed in Small Claims Court.  Because all of these actions were

2    designed to get hold of a piece of evidence that could be used against Harris, and

3    undermine any claim by Torres that he was the true purchaser of the gun, it is reasonable

4    to infer that Harris was aware of what Thomas was doing and concurred in his actions.

5    Indeed, Harris has specifically pled guilty to conspiring with Thomas in connection with

6    Thomas mailing his September 26, 2010 demand letter to Torres and filing the Small

7    Claims Court suit on September 28, 2010.

8         Then, once these actions were not successful and Thomas learned at the first Small

9    Claims Court hearing that the Torres gun was in RPD custody, Harris and Thomas

10   together changed tactics and took another course in an effort to damage the credibility of

11   Rios and Torres by hiring Chris Butler.  These acts were not only part of a course of

12   conduct designed to compromise any criminal investigations of Harris for the illegal

13   purchases of the guns for Rios and Torres, they were particularly unsavory and

14   uncharacteristic of the type of conduct one would expect from a law enforcement officer.

15        In addition to considering the offense conduct and Harris's history and

16   characteristics, the Court is required to impose a sentence that will reflect the seriousness

17   of the offense, promote respect for the law, and provide just punishment.

18   18 U.S.C.§ 3553(a)(2)(A).  In order to properly account for these factors, as well as those

19   already discussed, a sentence of 12 months in custody is sufficient, but not greater than

20   necessary.  A police officer engaging in lying on federal firearms forms in order to obtain

21   guns, and then engaging in a course of conduct to impede the investigation and

22   prosecution of those lies, is unquestionably a serious matter.  Harris may emphasize the

23   fact that he has already lost his job and livelihood as a law enforcement officer, and will

24   never be able to work in that field again, as a basis for this Court to consider some

25   leniency.  The government submits that these are all logical and appropriate consequences

26   of Harris's actions.  They must have been known to Harris over the period of time that he

27   committed the offenses, and he elected to continue breaking the law.

28   ///

1    The community, when looking at such conduct, would expect a sanction that appropriately

2    takes into account the gravity of a law enforcement officer willingly making such choices.

3         As this matter was being readied for trial, Harris accepted responsibility for his

4    actions and entered guilty pleas to his wrongful conduct.  There is no question that this

5    justifies a sentence at the low end of the applicable 12 to 18 month guideline range.

6    Requiring Harris to serve a term of imprisonment for the full 12-month term will properly

7    take into account the aggravating factors present in this case.

8                                  **<u>CONCLUSION</u>**

9         For the reasons stated above, the government recommends that the Court impose

10   the following sentence on defendant Danny Harris, Jr.: twelve months imprisonment; a

11   three-year term of supervised release with the conditions recommended in the Presentence

12   Report; and a $300 special assessment.  In light of Harris's current financial situation, the

13   government concurs in the Probation Officer's recommendation that no fine be imposed.

14   There are no restitution issues.

15

16   Dated: June 12, 2012                     Respectfully submitted,

17                                            MELINDA HAAG
                                             United States Attorney
18

19                                           _____/s/_____

20                                           SUSAN E. BADGER
                                             HARTLEY M.K. WEST
21                                           Assistant United States Attorneys

22

23

24

25

26

27

28

GOVT'S SENT. MEMO [HARRIS]
CR 11-0497 CW                    15